**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

                                Case No. 14-20249

v.                              Hon. Gerald E. Rosen

ELDEN CATTELL,

        Defendant.

_____/

**OPINION AND ORDER DENYING**
**DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ May 12, 2015 _____

PRESENT:  Honorable Gerald E. Rosen
                   Chief Judge, United States District Court

## I.  INTRODUCTION

Defendant Elden Cattell is charged in an April 24, 2014 indictment with two

counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2), and one

count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

Through the present pair of motions filed on August 15, 2014 and September 2, 2014,

Defendant seeks (i) to suppress statements he made to law enforcement officers on

January 27, 2014 and April 14, 2014, and (ii) to challenge a warrant to search his

residence as purportedly secured through an affidavit that included a materially false

statement.

On January 29, 2015, the Court conducted an evidentiary hearing on Defendant's two motions to suppress. The Government called as witnesses three agents of the Federal Bureau of Investigation ("FBI"), Special Agents Susan Lucas, Aaron Muscatello, and Corey Burras. Defendant presented the testimony of his wife, Karena Cattell. Having considered the testimony at the January 29 hearing, as well as the parties' briefs in support of and in opposition to Defendant's motions, their accompanying exhibits, and the remainder of the record, the Court now is prepared to rule on Defendant's motions. For the reasons stated below, the Court denies these motions.

## II.  FACTUAL BACKGROUND

### A.    The Investigation of Jason Soper

Law enforcement officers first became aware of the alleged activities of Defendant Elden Cattell during their investigation of another individual, Jason Soper. Soper is charged in another case before this Court with operating a child exploitation enterprise, several counts of production of child pornography, and single counts of transportation, receipt, and possession of child pornography. *See United States v. Soper,* No. 14-20042, 1/30/2014 Indictment.[1]  According to the Government, its investigation of Soper revealed that he "repeatedly sexually assaulted a seven-year-old girl (MV-1) and a five-year-old boy (MV-2), recorded the assaults, and distributed the images in exchange for child pornographic images of infants and toddlers."  (Gov't 9/29/2014 Response Br. at 2.)

---

[1]The present case initially was assigned to another District Judge, but was reassigned to this Court on April 30, 2014 as a companion to *Soper.*

2

Upon searching electronic devices and email accounts used by Soper, law enforcement officers discovered that he had communicated with "dozens of trading partners that use email accounts to send and receive child pornography." (Gov't 9/28/2014 Response, Ex. A, Search Warrant Aff. at ¶ 18.) One such alleged trading partner used the email account "pmmeadows@mail.com," and the Government determined through a series of administrative subpoenas that Defendant's wife, Karena Cattell, was the subscriber associated with this account. (*See id.* at ¶¶ 19-25.) Based on the communications exchanged between Soper and this email account, as well as other information uncovered upon further investigation (discussed in greater detail below), federal law enforcement agents sought and obtained a warrant to search Defendant's residence in Tecumseh, Michigan.

**B.     The Execution of the Warrant To Search Defendant's Home**

On January 27, 2014 at around 7:00 a.m., several law enforcement officers, including FBI Special Agents Susan Lucas and Aaron Muscatello, executed the warrant to search Defendant's home.[2] According to the testimony at the January 29, 2015 hearing, approximately 12 law enforcement officers participated in the execution of the search warrant, and Defendant's wife, Karena Cattell, estimated that five or six of these

---

[2]As detailed below, Special Agent Muscatello prepared the application and supporting affidavit for this search warrant.

3

officers initially entered her home while the rest waited outside.[3]  Ms. Cattell testified

that at least some of the officers outside her home had their guns drawn, and that the

officers who entered the home were armed but did not draw their weapons.

At the time the search warrant was executed, all four of Defendant's children were

still at home because school had been cancelled due to a snow day.[4]  Ms. Cattell met the

agents at the door, and also summoned her husband from the couple's bedroom.

Defendant was taken to the kitchen and placed in a chair, while Ms. Cattell and her

children were gathered in the living room.  Ms. Cattell testified that she was advised

within five to ten minutes after the officers entered her home that her children would be

taken to another location to be interviewed, and she estimated that she and her children

departed for these interviews approximately half an hour after the officers' arrival.

After he was led into the kitchen of his home, Defendant was interviewed by

Special Agents Lucas and Muscatello.  According to the uniform testimony of these two

agents at the January 29 hearing, the interview was conducted at Defendant's kitchen

table, and Defendant was not handcuffed or otherwise restrained at any time as he spoke

to the agents; to the contrary, the agents testified that Defendant got up from the table

---

[3]Ms. Cattell stated that as the search progressed, eight to ten officers eventually made
their way into her home.

[4]Indeed, Special Agent Muscatello testified that upon his arrival at Defendant's home, he
did not participate in the initial entry into the residence, but instead remained outside for a while
to assist with a fellow officer's vehicle that had gotten stuck in the snow.  After helping to free
this vehicle, Special Agent Muscatello entered the home and remained with Defendant, first to
ensure that he did not pose any safety concerns and then to interview him.

4

during the course of the interview to tend to the family dog and let the family cat into and out of the house.  Special Agents Lucas and Muscatello further testified (i) that before they engaged in any substantive questioning, they advised Defendant of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), (ii) that Defendant indicated that he understood these rights, evidencing no hesitation or confusion on this point, and (iii) that he signed a standard FBI form in which he agreed to waive these rights.  Special Agent Lucas conceded, however, that although it was her responsibility to maintain the *Miranda* waiver form signed by Defendant, she has been unable to locate this form in her files and does not know what happened to it.  Thus, no such *Miranda* waiver form appears in the record in this case.

The agents estimated that their interview of Defendant lasted less than two hours.  According to the agents, the interview was amicable and not confrontational, they did not yell at, threaten, or make any promises to Defendant, no other agents stood over or guarded Defendant while he spoke to Special Agents Lucas and Muscatello, and neither they nor any other agents in the home drew their weapons at any time during the interview.  The agents further stated that Defendant never asked for a lawyer or expressed any reluctance to speak to them, and that while Defendant was not affirmatively advised that he was free to leave, he never requested of his own volition that he be permitted to leave his home or that the agents discontinue their interview.[5]   Moreover, Special Agent

_____

[5]The agents conceded that if Defendant had wished to drive away from his home, he would have been prevented from doing so by the law enforcement vehicles blocking his

5

Muscatello testified that when Ms. Cattell came into the kitchen to say goodbye to her husband before she accompanied the couple's children to their off-site interviews, Defendant did not ask that he be allowed to go along with his wife and children.

In her testimony at the January 29 hearing, Ms. Cattell offered a somewhat different account of the agents' interview of her husband.  Ms. Cattell testified that as officers gathered her and her children in the living room, she was able to see into the adjoining kitchen and witness the interaction between Defendant and the agents who were questioning him.  According to Ms. Cattell, her husband was placed in a chair away from the kitchen table and surrounded by two agents, one on each side of him.[6]  Ms. Cattell heard the agents ask Defendant where in the home any computers could be found and who used these devices, and she also heard her husband advise the agents about guns that were kept in the master bedroom closet.  Throughout this questioning, Ms. Cattell never heard her husband being given *Miranda* warnings, nor did she observe the agents showing any form or piece of paper to Defendant or Defendant signing any such document.  She conceded on cross-examination, however, that she missed a portion of her husband's questioning as she left the living room to wake up her sons, but she estimated that she returned to the living room in less than a minute.  Ms. Cattell further

---

driveway.  They insisted, however, that these vehicles would have been moved if Defendant had expressed a desire to leave.

[6]Ms. Cattell stated that one of these agents was male and the other was female, which is consistent with the testimony of Special Agents Lucas and Muscatello that they conducted the interview of Defendant.

agreed on cross-examination that the agents did not yell or raise their voices as they interviewed her husband.

Ms. Cattell testified that she was never advised that she was free to leave; rather, she was told that Defendant was being kept for questioning and that her children would be taken elsewhere for questioning.[7]  Even apart from this, she did not perceive that she was free to leave, where there were vehicles lining the driveway of her home, armed agents outside, and a number of law enforcement personnel in her home.  In addition, Ms. Cattell testified that she was not permitted to speak to Defendant while he was being questioned.

As noted earlier, Ms. Cattell testified that she left her home with her children approximately half an hour after the law enforcement officers arrived at the residence. Under the uniform testimony of Special Agents Lucas and Muscatello, the interview of Defendant extended beyond Ms. Cattell's departure, as the agents estimated that this questioning lasted for approximately one and a half to two hours.[8]  Special Agent Muscatello testified that other law enforcement officers were continuing to carry out their search of the residence as he concluded his interview of Defendant, and he remained at the kitchen table with Defendant as his fellow officers completed this process.

---

[7]Special Agent Lucas testified, in contrast, that Ms. Cattell could have refused to allow her children to be interviewed.

[8]In addition, Special Agent Lucas testified that this interview did not even begin until roughly 30 or 40 minutes after the agents entered the premises.

According to Ms. Cattell, the agents were still conducting their search when she returned home at around 10:30 a.m., but they concluded their efforts and left the premises shortly thereafter.  The Government states that the agents seized a laptop computer during this search, with a subsequent forensic review of this computer allegedly "reveal[ing] approximately 135 images of child pornography, over one thousand images of child erotica, and numerous chat logs showing [Defendant] using various online personas to bait other users of a fi[l]e-sharing network into sending him child pornography and child erotica as [Defendant] pretended to be a teenage girl."  (Gov't 9/28/2014 Response Br. at 6.)

**C.      The Questioning of Defendant Following His April 14, 2014 Arrest**

Following the January 27, 2014 search of Defendant's residence and the forensic examination of the contents of the laptop computer seized during this search, the FBI obtained a warrant for Defendant's arrest and executed this warrant at Defendant's home on April 14, 2014.  Special Agent Muscatello testified at the January 29, 2015 hearing that this arrest was uneventful, with Defendant offering no resistance, and with the agents allowing Defendant to say goodbye to his wife and children and placing him in handcuffs only after he had left his residence.  Special Agent Muscatello estimated that he and Special Agent Corey Burras, the two arresting agents, remained in Defendant's home for only about five minutes while taking him into custody.

Defendant then was transported to the FBI's Ann Arbor office, where he was

8

questioned by Special Agents Muscatello and Burras.  The two agents testified that Defendant was advised of his *Miranda* rights shortly after his arrival at the FBI office, and the Government introduced into evidence an FBI "Advice of Rights" form disclosing these rights.  (*See* Gov't Ex. 3.)  Defendant's signature appears on this form, immediately following language stating that "I have read this statement of my rights and I understand what my rights are," and that "[a]t this time, I am willing to answer questions without a lawyer present."  (*Id.*)

In support of his present motion to suppress, Defendant acknowledges that he was advised of his *Miranda* rights following his arrest, but he contends that he then "requested an attorney and . . . refus[ed] to speak without a[n] attorney."  (Defendant's 8/15/2014 Motion to Suppress, Br. in Support at 8.)  According to Defendant, the agents responded to this request by stating that "he would have to be taken to Detroit and held until an attorney was found," and he was "left with the clear impression that it would be days, maybe weeks[,] before an attorney could be found."  (Defendant's 8/15/2014 Motion to Suppress, Br. in Support at 8.)  Defendant further asserts in his motion that he was told that "if he chose to speak 'now,' without a lawyer, then he 'would not have to go to Detroit,'" leaving him with "the clear and distinct impression that if he spoke then and there, without an attorney, not only would he be going home that very day, he would be treated less harshly in this matter."  (*Id.*)

The uniform testimony of Special Agents Muscatello and Burras at the January 29,

2015 hearing refutes Defendant's contentions on each of these points.  According to

Special Agent Muscatello, Defendant never asked for a lawyer or stated that he would not

talk to the agents, but instead spent several minutes asking the agents about his case and

debating out loud whether he should speak to them or get an attorney.  The agents

declined to respond to Defendant's apparent request for advice as to whether he should

seek the assistance of counsel, and merely advised Defendant that he had a right to an

attorney and that the decision was up to him.  Special Agent Muscatello testified that

Defendant eventually elected to sign the "Advice of Rights" form and agreed to answer

the agents' questions without a lawyer present, but that even after he signed this form,

Defendant was reminded that he could still call an end to the questioning at any time.

Special Agents Muscatello and Burras also rejected the notion that they promised

Defendant any sort of favorable treatment if he agreed to speak to them without a lawyer

present.  In particular, while Defendant claims in his motion that he was led to believe

that he could avoid being taken to Detroit, and perhaps could even be released, if he

agreed to answer the agents' questions without the assistance of counsel, both Special

Agent Muscatello and Special Agent Burras flatly denied that they had given any such

assurance to Defendant, and instead testified that it was their intention all along to deliver

Defendant to the U.S. Marshals in Detroit in time for him to be brought to duty court later

that day.  Special Agent Muscatello further testified that Defendant was expressly

advised that he would be taken to Detroit, regardless of whether he agreed to answer the

agents' questions.

More generally, Special Agent Muscatello denied that the agents made any promises or threats to Defendant as they spoke with him at the FBI office in Ann Arbor following his arrest.  Although the agents were armed during this meeting, they did not display their weapons at any point.  Special Agent Muscatello further stated that once Defendant agreed to answer the agents' questions without a lawyer present, he evidenced no reluctance to talk to the agents and needed no persuasion to respond to their queries, and that the conversation between Defendant and the agents was wholly cordial in nature.

Following these events, a grand jury returned a three-count indictment on April 24, 2014, charging Defendant with two counts of receiving child pornography and one count of possessing child pornography.  Through his two pending motions, Defendant challenges the January 25, 2014 warrant to search his residence as allegedly procured through a materially false statement, and he also seeks to suppress the statements he made to FBI agents during the January 27, 2014 execution of this search warrant and following his arrest on April 14, 2014 as involuntarily made in violation of his Fifth Amendment privilege against self-incrimination.

# III.  ANALYSIS

**A.    The Warrant to Search Defendant's Residence Was Supported by Probable Cause, Even with the Inaccurate Statement in Special Agent Muscatello's Affidavit Removed from the Inquiry.**

In the first of his two pending motions, Defendant challenges the January 25, 2014 warrant authorizing the search of his residence, arguing that the probable cause finding that supported this warrant impermissibly rested upon a materially false statement in Special Agent Muscatello's search warrant affidavit.  In response, the Government concedes that this affidavit included an inaccurate statement — namely, an incorrect description of a picture of a young girl sent from an email account allegedly linked to Defendant, suggesting that the girl was bare-chested when she was not — but it contends that even absent this statement, the affidavit readily supported the Magistrate Judge's finding of probable cause.  As discussed below, the Court finds that the Government has the better of the argument on this point.

Under *Franks v. Delaware,* 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978), a defendant is entitled to a hearing upon making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the [search] warrant affidavit," provided that this "allegedly false statement is necessary to the finding of probable cause."  Once the defendant has secured a hearing through this "substantial preliminary showing," if he is able to establish his allegation of "perjury or reckless disregard" by a preponderance of the evidence, and

12

if it is determined that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 156, 98 S. Ct. at 2676.

The warrant challenged by Defendant in the present motion was obtained through an application and supporting affidavit prepared by Special Agent Muscatello. This affidavit first details the FBI's investigation of Jason Soper, which began when Soper sent emails to an FBI undercover officer with pornographic images and a video of children that Soper identified as his 7-year-old daughter (MV-1) and 5-year-old son (MV-2). (*See* Gov't 9/28/2014 Response, Ex. A, Muscatello Aff. at ¶¶ 7-10.) The affidavit describes the execution of a search warrant at Soper's residence, which turned up "hundreds of images of child pornography" and "hundreds of emails between Soper and others" involving "the trading of child pornography and/or the discussion of sexual assaults of children, including MV#1 and MV#2." (*Id.* at ¶¶ 16-17.)[9] In addition, Soper made a statement to law enforcement officers in which he (i) admitted to sexually assaulting MV-1, MV-2, and "at least two other children," (ii) admitted to "creating and sharing child pornography of" MV-1 and MV-2, who he had sexually assaulted "repeatedly for years," and (iii) acknowledged ownership of the email account used to

_____

[9]These two children were found at Soper's residence during the execution of the search warrant.

13

communicate with and send child pornography to the FBI undercover officer.  (*Id.* at ¶

15.)

Special Agent Muscatello's affidavit next summarizes the investigation into

Soper's alleged interactions with Defendant.  According to the affidavit, a search warrant

for Soper's email account "revealed dozens of trading partners that use email accounts to

send and receive child pornography," and one such account was

"pmmeadows@mail.com," which was subsequently identified as belonging to

Defendant's wife Karena.  (*Id.* at ¶¶ 18-19, 25.)  The affidavit then recounts some of the

email communications between Soper and "pmmeadows@mail.com":

> a.  Soper and <u>pmmeadows@mail.com</u> exchanged several emails
> between August 26-27, 2013.

> b.  After a few emails about pictures, Soper sent
> <u>pmmeadows@mail.com</u> several pictures of MV #1 clothed.  The user of
> <u>pmmeadows@mail.com</u> responded:

> - "SHE IS A MODEL!!!!  If this realy (sic) is your daughter, you're
>   the luckiest man in the world!!!  She's amazingly, incredibly
>   gorgeous!!!  Please more!  Show me a fully clothed that you think I
>   might REALLY like.  Please!"

> - "Wow!!!!!!  I'm a little light headed!!!  WOW!  Her build is
>   amazing!!  She could be a model!  I wish the first one wasn't so
>   blurry.  But I'm not complaining!  Please, do you have any fully
>   clothed standing up or posing?  I'm still light headed!!! Thanks!"

> - "How do you deal with being around such beauty all the time!  You
>   must be hard 24 hrs a day!!"

> - "The idea that you JUST took those pictures is almost to [sic] much
>   to handle!!!  Is it wrong of me to want more, more, more!!!  Your

14

daughter's hotter than most the professional models out there — she's awesome (sic)!!!  How about somthing (sic) recent with a skirt or bikini?!  I really want to see her pose!!!  Please!  Please!  She's so hot!!!"

     c.  In another email, pmmeadows@mail.com sent Soper a picture of a girl, approximately 6-7 years of age, with her bare chest exposed and her skirt pulled up.  The young girl's vagina is the focus of the image and is only covered by her underwear.

     d.  On August 27, 2013, Soper sent pmmeadows@mail.com an image of an infant, approximately 1-2 years of age, naked with the child's legs spread and the focus of the image on the child's vagina.

(*Id.* at ¶ 19.)  In its response to Defendant's motion, the Government concedes that the statement at paragraph (c) above inaccurately describes the image sent by the "pmmeadows@mail.com" account to Soper,[10] and it is this inaccuracy that gives rise to the present motion challenging the January 25, 2014 search warrant.

The next portion of Special Agent Muscatello's affidavit describes the steps taken

---

[10]At an April 17, 2014 detention hearing, counsel for the Government characterized the images accompanying the email to Soper as follows:

The individual using pm[m]eadows, which has been tied by to [Defendant], sent two images of a girl, approximately six to 10 years of age, and there wasn't a bare chest and a skirt pulled up, but there were two images of this child.  She had some clothes on, but she was posed in a way where her legs were spread.  I think the [f]ocal point of both pictures can fairly be said to be her vagina, but there was clothing over the vagina, and I think — they call it essentially underwear, something very similar to underwear.  There is little clothing, but some clothing.

(4/17/2014 Detention Hearing Tr. at 6; *see also* Gov't 9/28/2014 Response Br. at 8-9 (describing these images as pictures of "two girls, approximately 6-10 years of age, with their legs spread, wearing short shorts or underwear-style athletic shorts").)  The Government offered copies of these images as exhibits at the January 29, 2015 hearing on Defendant's motions, (*see* Gov't Exs. 5, 6), and these exhibits confirm the accuracy of the Government's descriptions at the detention hearing and in its response to Defendant's motion.

to identify the user of the "pmmeadows@mail.com" email account.  Upon tracing this account to the Tecumseh, Michigan residence of Defendant and his wife, the affidavit states that a record search revealed that Defendant is a registered sex offender with an October 13, 2011 conviction for "attempted possession of child sexually abuse material." (Muscatello Aff. at ¶¶ 26-29.)  According to the affidavit, the police reports relating to this prior conviction indicated that Defendant had "viewed child pornography at his workplace."  (*Id.* at ¶ 30.)  In addition, an investigation conducted in connection with Defendant's prior conviction had uncovered a laptop computer at Defendant's residence that contained "over 200 images of child pornography and over 300 images of child erotica in the deleted space portion of [the] laptop," and a forensic examination of this computer had "revealed more than 4000 searches for 'preteen' in various file sharing software logs."  (*Id.* at ¶ 31.)

Against this backdrop, the Court turns to Defendant's request for a *Franks* hearing at which he could seek to establish a basis for suppressing the evidence seized during the execution of the January 25, 2014 search warrant at his home.  In Defendant's view, once the inaccurate statement regarding an image sent from the "pmmeadows@mail.com" account to Jason Soper is excised from Special Agent Muscatello's affidavit, the remaining content of this affidavit is insufficient to establish probable cause to search Defendant's residence.  In particular, while the inaccurate statement refers to a picture of a young girl "with her bare chest exposed and her skirt pulled up," (Muscatello Aff. at ¶

19(c)), Defendant asserts that the image actually sent to Soper was of a "fully clothed" girl who was not "pulling up her skirt," (Defendant's 9/2/2014 Motion, Br. in Support at 5). Defendant contends that this image is wholly consistent with the other emails sent from the "pmmeadows@mail.com" account requesting that Soper send more pictures of a "fully clothed" girl. (Muscatello Aff. at ¶ 19(b).) In addition, although Special Agent Muscatello's affidavit refers to a pornographic image of an infant sent by Soper to the "pmmeadows@mail.com" account, (*see id.* at ¶ 19(d)), Defendant observes that nothing in the affidavit suggests that "Defendant further engaged with Soper or even commented on that last photo" after Soper sent it, (Defendant's 9/2/2014 Motion, Br. in Support at 5), nor does the affidavit indicate that Defendant requested any image of this sort, as opposed to images of "fully clothed" girls.

Notwithstanding the acknowledged inaccuracy of the statement at paragraph 19(c) of Special Agent Muscatello's affidavit, the Court agrees with the Government that the remainder of this affidavit, with the mistaken assertion set to one side, establishes probable cause to search Defendant's residence. First, it is clear that this affidavit, despite its inaccuracy, nonetheless provides an ample basis for concluding that evidence of ***Soper's*** crimes would be found at Defendant's residence. As noted by the Government, the affidavit "describes Soper's repeated sexual assaults of MV-1 for years, his production of child pornography involving MV-1, and his distribution of those child pornographic images." (Gov't 9/28/2014 Response Br. at 10.) Against this backdrop,

17

the affidavit's identification of "pmmeadows@mail.com" as a "trading partner[]" in Soper's distribution of child pornography, along with its more specific account of communications exchanged between Soper and "pmmeadows@mail.com" — including Soper's transmission of images (albeit non-pornographic) of MV-1 and a pornographic image of an infant to this email account — establishes probable cause to believe that evidence of Soper's illegal child pornography distribution activities would be found on a computer at Defendant's residence.  Although Defendant protests that there is no evidence that he asked Soper to send any child pornographic images to the "pmmeadows@mail.com" account, the Government correctly points out that this is irrelevant to the question whether evidence of ***Soper's*** illegal activities was likely to be found on a computer at Defendant's residence associated with the "pmmeadows@mail.com" account.

In addition, the Court finds that Special Agent Muscatello's affidavit, absent its inaccurate statement, establishes probable cause to believe that evidence of Defendant's own unlawful conduct could be found at his residence.  As the Government observes, the affidavit states that after Soper sent non-pornographic pictures of a seven-year-old girl (MV-1) to the "pmmeadows@mail.com" account, the user of this account responded with a number of comments expressing sexual interest in this child.  (*See* Muscatello Aff. at ¶ 19(b).)  Such expressions of sexual interest in children lend support to a finding of probable cause.  *See United States v. Trewartha,* No. 08-20335, 2008 WL 4980617, at *3

18

(E.D. Mich. Nov. 24, 2008) (Edmunds, J.) (denying a motion to suppress where the search warrant affidavit "documented [the defendant's] sexual interest in children" and stated that child pornography had been emailed to an account used by the defendant).

Moreover, the affidavit's description of Defendant's prior conviction for a child pornography offense further bolsters a finding of probable cause.[11]  As stated in the affidavit, the investigation into this prior offense revealed that a laptop computer at Defendant's residence contained "over 200 images of child pornography," and a forensic examination of this laptop "revealed more than 4000 searches for 'preteen' in various file sharing software logs."  (Muscatello Aff. at ¶ 31.)  The Sixth Circuit has recognized that "[a]lthough a defendant's criminal history is not dispositive, it is relevant to the probable cause inquiry."  *United States v. Dyer,* 580 F.3d 386, 392 (6th Cir. 2009) (citations omitted); *see also United States v. Wagers,* 452 F.3d 534, 541 (6th Cir. 2006) (explaining that "a person of reasonable caution would take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause," and concluding that the defendant's prior conviction for possession of child pornography was "relevant, though not dispositive," in conducting this inquiry (internal quotation marks and citation omitted)).

Finally, it is likewise relevant to the probable cause inquiry that, according to Special Agent Muscatello's affidavit, Soper actually sent an image of child pornography

---

[11]The Government notes that Defendant remained on probation for this offense at the time of his communications with Soper.

19

to the "pmmeadows@mail.com" account that was subsequently traced to Defendant. (*See* Muscatello Aff. at ¶ 19(d).)  While the affidavit lacks any evidence that Defendant requested this image, the Court nonetheless concludes that the affidavit in its totality — disclosing (i) Defendant's sexually-oriented statements about a seven-year-old girl, (ii) his email communications with Soper, an admitted producer of child pornography, (iii) Defendant's prior conviction for a child pornography offense, and (iv) the discovery, in connection with this prior offense, that Defendant had possessed child pornography on a computer at his residence, along with (v) Soper's transmission of child pornography to an email account evidently used by Defendant — amply supports the "practical, common-sense" determination that "there [wa]s a fair probability that contraband or evidence of a crime w[ould] be found" at Defendant's residence.  *Illinois v. Gates,* 462 U.S. 213, 238 103 S. Ct. 2317, 2332 (1983).

As the Government observes, the Sixth Circuit has upheld determinations of probable cause that rested on weaker foundations than Special Agent Muscatello's affidavit provides here.  In a recent decision, the Sixth Circuit explained that "[i]n our prior cases challenging probable cause to search a home for child pornography, we have found that probable cause existed where a government investigation revealed the individual had a subscription or expired subscription to a website known to contain child pornography, and where an Internet Protocol address connected the subscriber to a location."  *United States v. Kinison,* 710 F.3d 678, 683-84 (6th Cir. 2013) (citations

omitted).  The court further pointed to an earlier ruling in which it "found probable cause to search a home even though the affidavit did not contain direct evidence the child pornography was accessed at home, and only established the individual had at some point forwarded an email containing child pornography."  *Kinison,* 710 F.3d at 684 (citation omitted).  Thus, the absence here of evidence that Defendant affirmatively reached out to obtain or access child pornography does not preclude a finding of probable cause to believe that evidence of a child pornography offense would be found at Defendant's home.

It also bears emphasis that the inaccurate statement here, if removed from Special Agent Muscatello's affidavit, does not significantly alter the nature of the evidence upon which the Magistrate Judge's finding of probable cause was based.  In particular, while the affidavit incorrectly states that the user of the "pmmeadows@mail.com" account sent Soper "a picture of a girl, approximately 6-7 years of age, with her bare chest exposed and her skirt pulled up," and that "[t]he young girl's vagina is the focus of the image and is only covered by her underwear," (Muscatello Aff. at ¶ 19(c)), the Government notes that the images actually sent from the "pmmeadows@mail.com" account to Soper depicted "two girls, approximately 6-10 years of age, with their legs spread, wearing short shorts or underwear-style athletic shorts," (Gov't 9/28/2014 Response Br. at 8-9).  Consequently, and as the Government correctly observes, both the images actually sent to Soper and the image mistakenly described in the affidavit "would constitute child erotica

21

images, not child pornography." (*Id.* at 9.)  There is no particular reason to believe, then, that the correction of Special Agent Muscatello's misstatement in his affidavit would have changed the outcome of the Magistrate Judge's probable cause inquiry, because the Magistrate Judge's determination of probable cause could not have rested upon any misconception that Defendant had used the "pmmeadows@mail.com" account to send child pornography to Soper.

In any event, even assuming that the challenged statement in Special Agent Muscatello's affidavit was "necessary to the [Magistrate Judge's] finding of probable cause," Defendant would not be entitled to a hearing — or the relief of suppression that could be awarded at such a hearing — absent a "substantial preliminary showing" that Special Agent Muscatello included this false statement in his affidavit "knowingly and intentionally, or with reckless disregard for the truth." *Franks,* 438 U.S. at 153-54, 98 S. Ct. at 2676.  The courts have emphasized that "[m]inor discrepancies" in a search warrant affidavit "may reflect mere inadvertence or negligence, rather than the reckless falsehood that is required for exclusion." *United States v. Elkins,* 300 F.3d 638, 649 (6th Cir. 2002); *see also United States v. Campbell,* 525 F. Supp.2d 891, 909 (E.D. Mich. 2007) (observing that "[m]ere inadvertence or negligence . . . is insufficient to require exclusion").

As the Government observes, the record here lacks any evidence that Special Agent Muscatello included the inaccurate statement found at paragraph 19(c) of his

22

affidavit with knowledge of its falsity or with reckless disregard for the truth. To be sure, Defendant points out that a law enforcement officer's reckless disregard for the truth may be (and typically is) proven circumstantially, through evidence of "obvious reasons to doubt the veracity" of the statement in question. *United States v. Cican,* No. 01-2296, 63 F. App'x 832, 837 (6th Cir. Apr. 22, 2003) (internal quotation marks and citations omitted). Yet, Defendant has failed to point to any such evidence of "obvious reasons" why Special Agent Muscatello should have doubted the accuracy of the statement in paragraph 19(c) of his affidavit. To the contrary, Special Agent Muscatello explained at the January 29 hearing that this inaccuracy was due to a communication error, where he did not have a copy of the image referenced in paragraph 19(c) in front of him as he prepared his affidavit, but instead was relying on a description provided by another agent with whom Special Agent Muscatello was speaking over the telephone at the time. The Court credits this account of inadvertent error, particularly given that the image inaccurately described in Special Agent Muscatello's affidavit was only marginally more probative of criminal activity than the two images actually sent by Defendant to Soper. This record evidences that Special Agent Muscatello's mistake was the product of mere inadvertence or negligence, and lends no support to a finding of reckless falsehood that would warrant a *Franks* hearing.

**B.     Because Defendant Was Advised of His *Miranda* Rights Prior to Any Custodial Interrogation, and Because He Was Not Coerced into Waiving These Rights, There Is No Basis for Suppressing His Statements.**

In the second of his two pending motions, Defendant seeks the suppression of statements he made to FBI agents during a January 27, 2014 interview at his home and following his April 14, 2014 arrest.  As recounted earlier, on the first of these occasions, several law enforcement officers executed a search warrant at Defendant's home, and two of these officers, Special Agents Lucas and Muscatello, spoke with Defendant while he was seated in his kitchen.  On the second occasion, Defendant was arrested pursuant to a warrant and taken to the FBI office in Ann Arbor, where he was questioned by Special Agents Muscatello and Burras.  Defendant argues that in each of these instances, he was subjected to a custodial interrogation and either was not advised of his *Miranda* rights or was coerced into making involuntary statements in violation of these rights.  As discussed below, however, the Court finds that Defendant was informed of his rights under *Miranda* prior to any custodial interrogation, and that he knowingly and voluntarily waived these rights before answering the agents' queries.

> **1.   Defendant's Statements to FBI Agents During the January 27, 2014 Search of His Home**

The Court turns first to the statements made by Defendant to Special Agents Lucas and Muscatello on January 27, 2014, as these and other law enforcement officers executed a warrant to search Defendant's residence.  According to the Government, the agents did not handcuff or otherwise restrain Defendant as they interviewed him at the kitchen table of his home, nor did they compel Defendant to answer their questions through threats or a show of force.  The Government further asserts that Defendant was

given "proper and complete" *Miranda* warnings, and that he executed a "standard FBI *Miranda* waiver form" reflecting his understanding of his rights under *Miranda* and his agreement to waive them.  (Gov't 9/29/2014 Response Br. at 8.)[12]  Defendant, in contrast, claims that in light of the entry into his "modest" home by "8-10 agents, all armed" and with guns drawn, he was "intimidated and very concerned for the safety of his wife and four small children, all of whom were home at the time of the execution of the search [warrant]."  (Defendant's 8/15/2014 Motion, Br. in Support at 7, 14.)  Defendant further asserts that the agents took his guns "for safe keeping" during the execution of the search warrant, and that "[h]is vehicles were blocked by the Government's vehicles," so that he was not free to drive away.  (*Id.* at 15.)  Finally, Defendant insists that he "was not fully *Mirandized* and was under arrest" at the time he was questioned by federal agents, resulting in admissions as to which of the computers at the residence he used and other "incriminating statements."  (*Id.* at 7.)

Under well-established principles founded upon the Fifth Amendment privilege against self-incrimination, "incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* rights."  *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir. 1998).  "The *Miranda* rule's application is limited to 'custodial interrogations,' which the Supreme Court has defined as[] questioning initiated by law enforcement officers after a person has been taken into

---

[12]As noted earlier, the Government concedes that it has been unable to locate the *Miranda* waiver form purportedly shown to and signed by Defendant.

custody or otherwise deprived of his freedom of action in a significant way." *Salvo,* 133 F.3d at 948 (internal quotation marks and citations omitted). "Thus, in order for *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest." *Salvo,* 133 F.3d at 948.

Upon considering the testimony at the January 29, 2015 evidentiary hearing, the Court finds that Defendant was not subjected to a custodial interrogation when he was interviewed by Special Agents Lucas and Muscatello during the search of his home. According to the uniform testimony of these two agents, this interview was conducted at Defendant's kitchen table, and Defendant was not handcuffed or otherwise restrained as he spoke to the agents, but rather was permitted to get up from the table during the interview to, for example, tend to the family pets. Special Agents Lucas and Muscatello further testified that neither they nor any other law enforcement officers in the home drew their weapons at any time during the interview, and that they did not yell at, threaten, or make any promises to Defendant. Although the agents did not expressly inform Defendant that he was free to leave, he did not evidence any reluctance to speak to the agents, ask for a lawyer, or request that the agents cease their questioning or that he be permitted to leave.

As the Government observes, the Sixth Circuit has recognized that the questioning of a suspect at his own residence "often do[es] not rise to the kind of custodial situation that necessitates *Miranda* warnings," as this typically is not a "hostile," "coercive," or

26

"inherently intimidating" environment. *Salvo,* 133 F.3d at 950-51; *see also United States v. Panak,* 552 F.3d 462, 466 (6th Cir. 2009) (noting the parties' agreement in that case that "an in-home encounter between the police and a citizen generally will be non-custodial"); *United States v. Paull,* 551 F.3d 516, 520, 524 (6th Cir. 2009) (affirming a district court's ruling that statements made by the defendant during a search of his home were not subject to suppression because the defendant had not "rebut[ted] the presumption that conversations in the home are non-custodial"); *Coomer v. Yukins,* 533 F.3d 477, 486 (6th Cir. 2008) (explaining that questioning in a suspect's own home "is usually indicative of the absence of the isolation inherent in custodial interrogations"). Likewise, the absence of handcuffs or other forms of physical restraint is suggestive of a non-custodial encounter. *See Panak,* 552 F.3d at 467 (observing that the police officers in that case "did not handcuff [the defendant] or physically restrain her" during their interview in her home, nor did they "otherwise limit her freedom of movement"). Finally, the length of the agents' questioning of Defendant — roughly an hour and a half, according to Special Agents Lucas and Muscatello[13] — is not indicative of custodial interrogation. *See Panak,* 552 F.3d at 467 (finding that an interview lasting between 45 minutes and an hour was non-custodial, and citing cases involving non-custodial interviews lasting between an hour and an hour and a half). In light of these factors reflective of a non-custodial interview of a suspect in his own home, and in the absence

---

[13]Defendant agrees that "[t]his questioning was admittedly brief." (Defendant's 8/15/2014 Motion, Br. in Support at 16.)

of any considerations that might overcome this presumption, the Court finds that the January 27, 2014 interview of Defendant was not a custodial interrogation that would trigger the *Miranda* rule.

In any event, Special Agents Lucas and Muscatello uniformly testified that Defendant was, in fact, advised of his *Miranda* rights before the agents commenced any substantive questioning of him, that he evidenced no uncertainty, lack of comprehension, or hesitation about these rights, and that he signed a form in which he agreed to waive these rights. Although the Government has been unable to produce a copy of the *Miranda* waiver form signed by Defendant, the Court nonetheless credits the testimony of Special Agents Lucas and Muscatello on this point, where these two agents separately testified entirely in accord with each other as to (i) the steps taken by Special Agent Lucas to inform Defendant of his *Miranda* rights, (ii) the use of a standard FBI form to advise him of these rights, and (iii) Defendant's agreement to sign this form, with the two agents then adding their signatures to this form. Accordingly, even if the Court were to conclude that the agents' questioning of Defendant in his home rose to the level of a custodial interrogation, the agents discharged their obligations under *Miranda* and its progeny by advising Defendant of his rights before they began this questioning, and by securing Defendant's voluntary and knowing agreement to waive these rights and respond to the agents' queries without a lawyer present.

The Court recognizes, of course, that Defendant's wife, Karena Cattell, offered

28

testimony at the January 29 hearing that differs in some respects from the accounts of

Special Agents Lucas and Muscatello.  Most notably, Ms. Cattell testified that as agents

gathered her and her children into the living room, she was able to witness the interaction

in the adjoining kitchen between her husband and the agents who were interviewing him,

and she stated that she did not hear the agents advise Defendant of his *Miranda* rights or

observe them showing any sort of form or document to him as he was being questioned.

Yet, Ms. Cattell's testimony further revealed that she was regularly interacting with law

enforcement officers in her living room as her husband was being questioned in the next

room, and that she was occupied with the process of gathering up her children and

preparing them (as well as herself) to depart for off-site interviews.  Indeed, Ms. Cattell

acknowledged that she missed a portion of her husband's interview when she left the

living room to wake up her sons, although she estimated that this took less than a minute.

In addition, Ms. Cattell testified that the agents were still interviewing her husband when

she and her children left the home, so she plainly cannot say what happened after she left.

Consequently, while the Court found Ms. Cattell to be a generally credible witness, her

testimony does not provide a basis for the Court to discount the uniform and equally

credible testimony of Special Agents Lucas and Muscatello that Defendant was advised

of his *Miranda* rights and agreed to waive these rights before the agents began their

substantive questioning of him.

**2.      Defendant's Statements to FBI Agents Following His April 14, 2014
        Arrest**

Defendant next seeks to exclude the statements he made to FBI Special Agents Burras and Muscatello on April 14, 2014 at the FBI office in Ann Arbor, following his arrest at his home pursuant to a warrant.  The parties agree that Defendant was advised of his *Miranda* rights on this occasion.  Defendant states that he then requested an attorney and refused to speak until counsel was provided to him.  According to Defendant, the FBI agents responded to this request by stating that he would have to be "taken to Detroit and held until an attorney could be found," leaving him "with the clear impression that it would be days, maybe even weeks before an attorney could be found."  (Defendant's 8/15/2014 Motion, Br. in Support at 8.)  Defendant further asserts that the agents advised him "that if he chose to speak 'now,' without a lawyer, then he 'would not have to go to Detroit,' leaving him with "the clear and distinct impression that if he spoke then and there, without an attorney, not only would he be going home that very day, he would be treated less harshly in this matter."  (*Id.*)  Defendant contends that "[h]is will was overcome by these implied threats and suggestions of leniency," (*id.* at 9), such that his subsequent statements to the agents were the product of coercion and therefore involuntary.

This account put forward in Defendant's motion, however, is contradicted in several key respects by the uniform testimony of Special Agents Muscatello and Burras at the January 29, 2015 evidentiary hearing.  As recounted earlier, these agents denied that Defendant asked for a lawyer or expressed unwillingness to speak to the them, and

30

instead testified that Defendant debated out loud whether he should get an attorney and seemed to be seeking the agents' advice on this point.  The agents further testified that they declined Defendant's apparent request for advice, merely reiterating that he had a right to an attorney and that this decision was his to make.  According to the agents, Defendant ultimately agreed to answer their questions without a lawyer present, and he evidenced this agreement by signing the FBI "Advice of Rights" form that informed him of his *Miranda* rights and sought his consent to be interviewed without a lawyer.  (*See* Gov't Ex. 3, Advice of Rights form.)  In addition, the agents denied that they promised Defendant any sort of favorable treatment, such as a prompt release from custody, if he agreed to speak to them without a lawyer present, and they likewise denied saying anything to Defendant that could have led him to believe that his period of detention would be extended or adversely impacted in some way — *e.g.,* by being taken to Detroit — if he exercised his right to counsel.  Rather, Special Agents Muscatello and Burras both testified that it was their intention all along to deliver Defendant to the U.S. Marshals in Detroit, in accordance with the warrant for his arrest, and Special Agent Muscatello further testified that Defendant was expressly informed that this would occur, regardless of whether he submitted to questioning by the agents.[14]  More generally,

---

[14]Indeed, the Government observes that it would have made no sense for the agents to promise Defendant that he could avoid going to Detroit and would be immediately released if he spoke to the agents without an attorney present, given that Defendant had been named in a federal arrest warrant and thus would have to be brought to Detroit for an initial appearance before a Magistrate Judge.  (*See* Gov't 9/29/2014 Response Br. at 10.)

Special Agent Muscatello testified that the agents made no promises or threats to Defendant as they spoke with him following his arrest.

The Court credits the uniform and wholly consistent testimony of Special Agents Muscatello and Burras as to what transpired during their April 14, 2014 interview of Defendant at the FBI office in Ann Arbor.  There is no dispute that the agents advised Defendant of his *Miranda* rights, including the rights to consult with a lawyer before answering the agents' questions and to insist that a lawyer be present during any questioning.  Nothing in the record suggests that Defendant was confused or uncertain about these rights, nor is there any evidence of threats, promises, or coercive conduct that could have overborne Defendant's will or undermined his ability to make a knowing and voluntary decision whether to exercise or waive these rights.  Moreover, it bears emphasis that Defendant's claim that he asked for an attorney is refuted by his signature on the FBI "Advice of Rights" form, through which he acknowledged that he understood his rights and was willing to answer questions without a lawyer present.  (*See* Gov't Ex. 3, Advice of Rights form.)

Under this record, the Court finds no evidence of objectively coercive activity by the FBI agents that could have overborne Defendant's will and rendered his statements to the agents involuntary.  *See United States v. Rutherford,* 555 F.3d 190, 195 (6th Cir. 2009).  The Court further concludes that the Government has met its burden of showing that Defendant knowingly and voluntarily waived his *Miranda* rights when he was

32

advised of these rights, signed the FBI "Advice of Rights" form, and then proceeded to

answer the agents' questions without attempting to invoke these rights.  *See United States*

*v. Adams,* 583 F.3d 457, 467 (6th Cir. 2009).  It follows that there is no basis for

suppressing the statements made by Defendant to Special Agents Muscatello and Burras

following his April 14, 2014 arrest.

### IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's August 15,

2014 motion to suppress admissions (docket #28) is DENIED.  IT IS FURTHER

ORDERED that Defendant's September 2, 2014 motion to suppress evidence seized

pursuant to search warrant (docket #30) also is DENIED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  May 12, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on May 12, 2015, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135